1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JENIFER LYNN MURRY,                    No.  2:13-CV-0139 AC

12              Plaintiff,

13        v.                               ORDER

14   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,
15
                Defendant.
16

17

18        Plaintiff, proceeding with representation, seeks judicial review of a final decision of the

19   Commissioner of Social Security ("Commissioner") denying her application for Supplemental

20   Security Income ("SSI") under Title XIV of the Social Security Act.  Administrative Record

21   ("AR") 14.  The parties' cross-motions for summary judgment are pending, as is plaintiff's

22   request for remand with instructions to award benefits.  For the reasons discussed below, the court

23   will grant plaintiff's motion for summary judgment and remand (ECF No. 13-1) in part, and will

24   deny defendant's motion for summary judgment (ECF No. 14-1).

25                         PROCEDURAL BACKGROUND

26        Plaintiff Jenifer Lynn Murry filed an application for SSI on July 26, 2011, alleging

27   disability beginning on January 1, 1993.  AR 138-42.  Plaintiff's application was denied initially

28   and again upon reconsideration.  AR 98-102, 106-11.  On July 3, 2012, a hearing was held before

administrative law judge ("ALJ") Jean R. Kerins.  AR 47-74.  Plaintiff appeared with attorney representation at the hearing, at which she, her mother Catherine Murry, and vocational expert Susan Creighton-Clavel testified.  Id.  In a decision dated August 20, 2012, the ALJ found plaintiff not disabled.  AR 14-23.  The ALJ made the following findings (citations to 20 C.F.R. omitted):

> 1.   The claimant has not engaged in substantial gainful activity since July 26, 2011, the application date.
>
> 2.  The claimant has the following severe impairments: asthma and fibromyalgia.
>
> 3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 4.  After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she is to avoid moderate exposure to extreme cold, noise, fumes, odors, dust, gases, and other respiratory irritants and concentrated exposure to hazardous heights and machinery.
>
> 5.  The claimant has no past relevant work.
>
> 6.  The claimant was born on October 12, 1991 and was 19 years old, which is defined as a younger individual age 18-49, on the date the application was filed.
>
> 7.  The claimant has at least a high school education and is able to communicate in English.
>
> 8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.
>
> 9.  Considering the claimant's age, education, and work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
>
> 10.  The claimant has not been under a disability, as defined by the Social Security Act, since July 26, 2011, the date the application was filed.

AR 16-23.

Plaintiff requested review of the ALJ's decision by the Appeals Council, but the Council denied review on November 26, 2012, leaving the ALJ's decision as the final decision of the Commissioner.  AR 1-4.

2

1    FACTUAL BACKGROUND

2        Born on October 12, 1991, plaintiff was two years old on the alleged onset date of

3    disability.  AR 45.  She was nineteen years old at the time her SSI application was filed, AR 138,

4    and twenty years old at the time of the administrative hearing.  AR 50.  Plaintiff has a high school

5    diploma and has taken one semester in community college, during which she took two courses.

6    AR 50-51.  She has no past relevant employment.  She did, however, volunteer at a thrift store

7    during the twelfth grade (2010-2011) starting at one day per week and progressing to

8    volunteering for a few hours per day every day of the work week.  AR 57.  She stopped

9    volunteering during the summer of 2011.  Id.

10    LEGAL STANDARDS

11       The Commissioner's decision that a claimant is not disabled will be upheld if the findings

12   of fact are supported by substantial evidence in the record and the proper legal standards were

13   applied.  Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000);

14   Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tackett v. Apfel,

15   180 F.3d 1094, 1097 (9th Cir. 1999).

16       The findings of the Commissioner as to any fact, if supported by substantial evidence, are

17   conclusive.  See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

18   more than a mere scintilla, but less than a preponderance.  Saelee v. Chater, 94 F.3d 520, 521 (9th

19   Cir. 1996).  "It means such evidence as a reasonable mind might accept as adequate to support a

20   conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

21   N.L.R.B., 305 U.S. 197, 229 (1938)).  "While inferences from the record can constitute

22   substantial evidence, only those 'reasonably drawn from the record' will suffice."  Widmark v.

23   Barnhart, 454 F.3d 1063, 1066 (9th Cir.2006) (citation omitted).

24       Although this Court cannot substitute its discretion for that of the Commissioner, the

25   Court nonetheless must review the record as a whole, "weighing both the evidence that supports

26   and the evidence that detracts from the [Commissioner's] conclusion."  Desrosiers v. Sec'y of

27   Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir.1988); see also Jones v. Heckler, 760 F.2d

28   993, 995 (9th Cir.1985).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). However, the court may review only the reasons stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did not rely." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir.2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).

The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Comm'r, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

ANALYSIS

Plaintiff seeks summary judgment and requests remand with instructions to award benefits on the grounds that: (1) the ALJ erred when she failed to give clear and convincing reasons for the apparent rejection of treating rheumatologist, Mark Mansour, MD; and (2) the ALJ committed a reversible error in evaluating plaintiff's credibility. The Commissioner argues that the ALJ's decision is supported by substantial evidence and is free from legal error.

A.     Rejection of Dr. Mansour's Opinion

While the ALJ found that plaintiff has severe asthma and fibromyalgia, the ALJ also decided that plaintiff has the residual functional capacity ("RFC") to perform a full range of work, with the nonexertional limitations that she "avoid moderate exposure to extreme cold, noise, fumes, odors, dusts, gases, and other respiratory irritants and concentrated exposure to hazardous heights and machinery." AR 17-18. The ALJ reached this conclusion by rejecting the opinion of treating physician Dr. Mansour, and instead following the opinion of Dr. Acinas, a nonexamining agency physician. AR 21-22. Plaintiff contends that this was in error. Pl.'s Mot. Summ. J. 10, ECF No. 13-1.

1       1.  <u>Relevant Facts</u>

2          a.  <u>Dr. Mansour's Opinion</u>

3      Mark Mansour, MD, is a practicing rheumatologist who has been treating plaintiff since

4 September 2011.  AR 475.  On September 8, 2011, Dr. Mansour first saw plaintiff for muscle

5 pain ("myalgias") and ordered a full panel of diagnostic lab tests to test plaintiff's SSB antibodies

6 for Sjoren syndrome; RNP antibodies for mixed connective tissue disease, systemic lupus

7 erythematosus, and systemic sclerosis; Smith antibodies for systemic lupus erythematosus or

8 renal disease; a cardiolipin panel for antiphospholipid antibody syndrome; scleroderma antibodies

9 to test for scleroderma; and to test for anti-DNA antibodies.  AR 329-34.  The results of these lab

10 tests were in the normal range, with the exception that plaintiff tested positive for the presence of

11 Antinuclear Antibodies ("ANA").[1]  AR 341-46, 411.

12      On February 2, 2012, Dr. Mansour again saw plaintiff for myalgias and performed a full

13 examination.  AR 410-11.  He noted that plaintiff "continues to have chronic muscle pain and

14 fatigue."  AR 410.  He did a general examination and found that plaintiff was alert, oriented, and

15 had normal mental affect.  <u>Id.</u>  He found plaintiff had full movement in all joints, no deformities,

16 no synovitis, no joint tenderness, and the presence of eighteen out of eighteen tender points.  <u>Id.</u>

17 Dr. Mansour determined that she had an unspecified disorder of muscle, ligament, and fascia and

18 ordered an additional panel of lab tests to try to determine what was causing plaintiff's

19 widespread pain ("hyperpathia").  AR 410-11.  Dr. Mansour concluded that the combination of

20 hyperpathia, the presence of eighteen out of eighteen tender points, and the positive ANA test

21 "brings up the possibility of fibromyalgia."  AR 411.  He prescribed Neurontin to see if this

22 helped treat plaintiff's pain and scheduled a follow-up appointment for two months later.  <u>Id.</u>

23      On April 12, 2012, Dr. Mansour again saw plaintiff for myalgias and performed an

24 _____

25 [1] Antinuclear Antibodies are proteins made by the immune system that mistakenly target and attack normal proteins within the nuclei of cells in the body.  Joan Marie Von Feldt, MD,

26 <u>Antinuclear Antibodies</u>, American College of Rheumatology (Feb. 2012), http://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Antinuclear_

27 Antibodies_(ANA)/.  While ANAs are present in three to fifteen percent of healthy individuals, ANAs can signal the body to begin attacking itself, which can lead to various autoimmune

28 diseases.  <u>Id.</u>

examination.  AR 408.  Plaintiff complained of "chronic pain in her muscles from head to toe."  Id.  He again found that eighteen out of eighteen tender points were present and that plaintiff had full movement of joints, no joint deformities or synovitis, and no joint tenderness.  Id.  He also found that plaintiff was alert and oriented and generally normal psychologically and was in no acute distress.  Id.  Dr. Mansour concluded based on plaintiff's reports of vertigo that she could not tolerate the prescribed Neurontin and instead prescribed her Lyrica.  Id.

On July 26, 2012, Dr. Mansour wrote a letter on behalf of plaintiff addressing the relationship between plaintiff's impairments and her ability to do work.  AR 475.  There, Dr. Mansour stated that plaintiff "suffers from fibromyalgia which causes severe joint and muscle discomfort."  Id.  He opined that fibromyalgia "prevents [plaintiff] from performing even the most basic tasks. It is difficult for her to sit or stand for more than 15 minutes at a time without experiencing significant muscle stiffness and pain. She will require breaks at least every 20 minutes.  If working, I would expect her to miss work at least 5 times a month due to pain."  Id.  He determined that "[h]er chronic pain causes problems with focus and concentration.  In addition, the medications she has tried including Neurontin and Lyrica, cause significant sedation throughout the day and problems with short-term memory."  Id.  Dr. Mansour's conclusion was plaintiff's symptoms "would make it incredibly difficult for her to maintain a full time job."  Id.

### b.  Dr. Acinas's Opinion

Mary Acinas, MD, is a nonexamining state agency medical consultant employed by the Social Security Agency to review disability applications and make disability determinations.  AR 21.  Dr. Acinas is a family or general practice physician.[2]  See AR 93.  Dr. Acinas was the nonexamining physician for plaintiff's disability determination at the reconsideration level.  AR 84-92.  She completed her reconsideration of plaintiff's disability on February 27, 2012.  AR 91.

The disability determination reconsideration form that Dr. Acinas completed lists

---

[2] Part 32B on the "Disability Determination and Transmittal" form requires a code that indicates the nonexamining physician's specialty.  AR 91.  Dr. Acinas's specialty code is twelve, which indicates she is a family or general practitioner.  Beth Laurence, Find Out What Type of Medical Consultant Reviewed Your Social Security Disability Claim (June 24, 2014, 9:45 AM), http://www.disabilitysecrets.com/resources/disability/find-out-what-type-medical-consultant-reviewed (based on David Morton, Nolo's Guide to Social Security Disability (7th ed. 2014)).

plaintiff's reported impairments from the initial disability claim as severe asthma and allergies, constant headaches, and jaw pain.  AR 84.  Per the claimant-supplied information included on the form, plaintiff was noted to have "very bad headaches that medication does not help.  The pain in my hip has become much worse, and I have pain daily now. It is a shooting pain down into my bones."  AR 85.  As to any new injuries, illnesses, or conditions since last completing the disability report, it is noted that plaintiff now has "headaches and hip pain on a daily basis.  Medications don't help, neither does lying down.  I can't go to school.  I also have mild scoliosis.  My asthma and allergies have become worse."  Id.

Under the section titled "Medically Determinable Impairments and Severity," Dr. Acinas considered only the diagnoses of migraines and asthma.  See AR 89.  Ultimately, Dr. Acinas agreed with the initial disability determination and decided that plaintiff was not disabled.  AR 92.  In coming to this conclusion, Dr. Acinas relied on evidence that included documents from Dr. Mansour, Dr. Pathak, and Dr. Miller, as well as various documents from unknown sources[3] of evidence.  AR 85-88.  Factors relevant to her decision were that the brain imaging was negative for an indication of the cause of plaintiff's headaches, that she believed plaintiff's medication trial of only two weeks was inadequate, and the inadequate attempt comment on one of plaintiff's lung function tests paired with plaintiff's lungs being clear the majority of the time.  These factors led Dr. Acinas to decide plaintiff has an RFC with only environmental limitations.  AR 89.

Dr. Acinas opined that plaintiff had the maximum sustained work capability for heavy or very heavy work based on the seven strength factors of physical RFC (lifting, carrying, standing, walking, sitting, pushing, and pulling).  AR 91.  She also concluded that plaintiff had environmental limitations impacting her RFC based on plaintiff's chronic headaches, allergies, and asthma.  Id.  These include avoiding even moderate exposure to extreme cold, noise, fumes, odors, dusts, gases, and poor ventilation; and concentrated exposure to hazards such as machinery and heights.  AR 90-91.  Dr. Acinas determined plaintiff's statements regarding her symptoms were partially credible based on her opinion that plaintiff's symptoms were controllable with

---

[3] This appears to primarily consist of various questionnaires and other like evidence supplied by plaintiff or plaintiff's counsel.  AR 85-88.

1    ongoing medication and treatment.  AR 90.

2            2. <u>Legal Standards</u>

3        There are three types of physicians relevant to disability determinations: treating[4]

4    physicians, examining[5] physicians, and nonexamining[6] physicians.  "If a treating doctor's opinion

5    is not contradicted by another doctor (*i.e.*, there are no other opinions from examining or

6    nonexamining sources), it may be rejected only for 'clear and convincing' reasons supported by

7    substantial evidence in the record."  <u>See</u> <u>Ryan v. Comm'r of Soc. Sec. Admin.</u>, 528 F.3d 1194,

8    1198 (9th Cir. 2008); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  "If the ALJ rejects a

9    treating or examining physician's opinion that is contradicted by another doctor, he must provide

10   specific, legitimate reasons based on substantial evidence in the record."  <u>Valentine v. Comm'r of</u>

11   <u>Soc. Sec. Admin.</u>, 574 F.3d 685, 692 (9th Cir. 2009); <u>Ryan</u>, 528 F.3d at 1198.[7]

12       "[T]he medical opinions of a claimant's treating physicians are entitled to special weight."

13   <u>Embrey v. Bowen</u>, 849 F.2d 418, 421 (9th Cir. 1988).  If the ALJ disregards a treating physician's

14   opinion, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting

15

16   _____

     [4] A treating physician is a doctor "who has provided treatment to the claimant on more than one

17   occasion."  <u>See</u> 20 C.F.R. § 404.1527.  Whether a physician is a treating physician is determined
     based on the "duration of the relationship and the frequency and nature of the contact."  <u>Le v.</u>

18   <u>Astrue</u>, 529 F.3d 1200, 1201 (9th Cir. 2008) (quoting <u>Benton v. Barnhart</u>, 331 F.3d 1030, 1038
     (9th Cir. 2003) (citation omitted)).

19   [5] An examining (or consulting) physician "examines a patient once, not for the purpose of treating
     the patient, but only for the purpose of providing a diagnosis for some other individual or

20   agency."  <u>See</u> 20 C.F.R. § 404.1527.
     [6] The Social Security Administration has physicians on its staff called nonexamining physicians

21   who read and review disability application case files and make conclusions about claimants'
     disability statuses and Residual Functional Capacities.  <u>See</u> 20 C.F.R. § 404.1527.

22   [7] As to the appropriate standard to apply to the facts of this case, the Commissioner appears to
     argue that Dr. Acinas's opinion contradicts Dr. Mansour's opinion.  Def.'s Cross-Mot. Summ. J.

23   8:13-9:7.  However, Dr. Acinas did not evaluate plaintiff's diagnosis and symptoms related to
     fibromyalgia, instead focusing only on her initial complaints of asthma and migraines, which are

24   the only complaints listed in the medical documentation reviewed by Dr. Acinas.  <u>See</u> AR 89-92.
     Because Dr. Mansour is the only physician to evaluate plaintiff's fibromyalgia, which he

25   diagnosed after Dr. Acinas issued her opinion, Dr. Mansour's opinion cannot have been
     contradicted by that of Dr. Acinas, and thus the "clear and convincing" evidence standard would

26   be applied to the ALJ's rejection of Dr. Mansour's opinion.  Regardless, for the purposes of the
     instant motion, the Court will assume that these two medical opinions contradict each other and

27   will therefore apply the 'specific and legitimate' standard to the facts of this case.

28

clinical evidence, stating his interpretation thereof, and making findings." Id. (quoting Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986)).  Moreover, [t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.  Thomas, 278 F.3d at 957 (citation omitted). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions."  Esposito v. Astrue, 2012 WL 1027601, at *3 (E.D. Cal. Mar. 26, 2012).

A nonexamining physician's function is to read medical evidence in claimants' case records, decide whether or not the claimants' impairments meet or equal the Listings, and determine the claimants' Residual Functional Capacities.  20 C.F.R. § 416.927(e)(1)(i).  Because nonexamining physicians do not have the benefit of hearing the claimant's complaints of pain, their opinions as to claimants' pain are of "very limited value."  Penny v. Sullivan, 2 F.3d 953, 957 (9th Cir. 1993).

The Ninth Circuit has found that "[t]he ALJ has the duty to develop the record . . . even when the claimant is represented by counsel."  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  "If the ALJ thought he needed to know the basis of [physicians'] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."  Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); see also Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1999); Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587, 589-90 (9th Cir. 1998) (holding that where the record is ambiguous as to the onset of disability, the ALJ must call a medical expert to aid in determining the onset date).

The weight given to a particular physician's opinion is also partially determined by the physician's specialty or practice area, especially for diseases that are complex and difficult to diagnose.  "Specialized knowledge is particularly important with respect to a disease such as fibromyalgia, which is poorly understood within much of the medical community."  Contreras v. Astrue, 378 Fed. Appx. 656, 658 (9th Cir. 2010) (quoting Benecke v. Barnhart, 379 F.3d 587 (9th

Cir. 2004)).  For fibromyalgia, the relevant specialty is rheumatology, and greater weight is therefore afforded to a rheumatologist's opinion because it is an "opinion of a specialist about medical issues related to his or her area of specialty."  Worthen-Smith v. Colvin, 2013 WL 4049050 (E.D. Cal. Aug. 9, 2013) (citing 20 C.F.R. § 404.1527(c)(5); see also Holohan v. Massanari, 246 F.3d 1195, 1202 n. 2 (9th Cir. 2001) (treating source's opinion "maybe entitled to little if any weight.  This might be the case, for instance, if the treating physician . . . offers an opinion on a matter not related to his or her area of specialization").  "Specialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community."  Benecke, 379 F.3d at 595 n.4; see also Howell v. Astrue, 248 Fed. Appx. 797, 799-800 (9th Cir. 2007); 20 C.F.R. § 404.1527(d)(5).  In fact, the District Court for the District of Columbia found it was a reversible error by the ALJ to not give controlling weight to the opinion of a treating physician who diagnosed the claimant as suffering from fibromyalgia where there was no medical evidence to contradict the diagnosis.  Stackhouse v. Barnhart, 435 F. Supp. 2d 28 (D.D.C. 2006).

The Ninth Circuit has noted that fibromyalgia is a definite but elusive affliction:

> [F]ibromyalgia, previously called fibrositis, [is] a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. [citations omitted] Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease. [citations omitted] Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community. *The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.*  The American College of Rheumatology issued a set of agreed upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis. [citations omitted]

Benecke, 379 F.3d at 589 (emphasis added).  Fibromyalgia "symptoms are entirely subjective." Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872 (9th Cir. 2004) (citing Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)).  There are no objective tests which can be used to conclusively confirm a diagnosis of fibromyalgia.  Benecke, 379 F.3d at 594 (deciding "[t]he ALJ erred by 'effectively requir[ing] "objective" evidence for a disease that eludes such measurement.'" (quoting Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir.

2003))); Jordan, 370 F.3d at 872 (finding "[t]here are no laboratory tests for the presence or severity of fibromyalgia."). A lack of objective test results does not entitle the ALJ to discount a diagnosis of fibromyalgia. See Stanley v. Astrue, CIV S-10-0563 EFB, 2011 WL 4565873 (E.D. Cal. Sept. 29, 2011) (finding that "the ALJ's assertion that the treating physicians based their diagnoses on plaintiff's subjective remarks and medical history is not a 'clear and convincing' reason for rejecting their opinions.").

"[D]iagnosis is now based on patient reports of a history of pain in five parts of the body, and patient reports of pain when at least 11 of 18 points cause pain when palpated by the examiner's thumb." Jordan, 370 F.3d at 872. "Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia." Id. "Objective physical signs, laboratory results, and x-ray results are generally negative, and '[b]ecause the majority of patients appear tense and anxious and have no recognizable objective basis for symptoms, the syndrome is often considered psychogenic.'" Id. (quoting 1 Cecil Textbook of Medicine 208 (Paul Besson, et al., eds., 15th ed. 1979)). The Ninth Circuit, "however, has recognized fibromyalgia as a physical rather than a mental disease." Id. (citing Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 796, 799 (9th Cir. 1997)).

Fibromyalgia is diagnosed by "a process of exclusion and a 'testing of certain 'focal tender points' on the body for acute tenderness.'" Bunnell v. Sullivan, 947 F.2d 341, 342 (9th Cir. 1991) (citing Preston v. Sec'y of Health & Human Servs., 854 F.2d 815, 817-18 (6th Cir. 1988)). The Social Security Administration has endorsed the American College of Rheumatology standard that a diagnosis requires the presence of at least eleven out of eighteen tender points on digital palpation and widespread pain throughout the four quadrants of the body. Benecke, 379 F.3d at 590; Wolfe F, et al., 1990 Criteria for the Classification of Fibromyalgia (Excerpt), American College of Rheumatology (last visited July 7, 2014), http://www.rheumatology.org/ practice/clinical/ classification/fibromyalgia/fibro.asp. Common symptoms "include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." Benecke, 379 F.3d at 590 (citing Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003); Cline v. Sullivan,

939 F.2d 560, 563 (8th Cir. 1991)).  "The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." Stone v. Astrue, 804 F. Supp. 2d 975, 984 (D. Ariz. 2011) (citing Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 244 (6th Cir. 2007)).

3.  Analysis

The ALJ provided three reasons for favoring the nonexamining physician's opinion over that of the treating specialist physician, none of which constitute specific, legitimate reasons based on substantial evidence.[8]  First, the ALJ opined that Dr. Mansour failed to "establish the date that the symptoms became this severe." AR 21.  However, is it the ALJ's duty to develop the record. DeLorme, 924 F.2d at 849.  Thus, if the record was unclear as to the date plaintiff's symptoms became severe, the ALJ had a responsibility to conduct further inquiry to obtain this information. Armstrong, 160 F.3d at 589-90.  The ALJ cannot discredit the treating physician's opinion based on the absence of an onset date which she failed to acquire or inquire about before making a determination.

Second, the ALJ asserted that Dr. Mansour's opinions are summary as to plaintiff's ability to work and thus do not constitute a medical source statement ("MSS") that should be accorded weight but are instead an opinion on matters reserved for the Commissioner. AR 21.  Generally, an MSS is a written opinion from an acceptable medical source[9] "about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." Titles II & XVI: Med. Source Opinions on Issues Reserved to the Comm'r, SSR 96-5P (S.S.A July 2, 1996).  It is unclear to the Court how Dr. Mansour's letter is anything but an MSS: he explains how plaintiff's fibromyalgia symptoms impact her physical and mental capabilities and how these limitations impact her

---

[8] The Commissioner presents additional arguments in Defendant's Cross-Motion for Summary Judgment, however, these arguments are new arguments that were not made by the ALJ in her decision and thus cannot be considered by this Court. Orn, 495 F.3d at 630.
[9] Acceptable medical sources are licensed physicians (medical or osteopath doctors), licensed or certified psychologists (for establishing intellectual or learning disabilities), licensed optometrists (for diagnosing visual disorders), or licensed podiatrists (for foot or ankle impairments only), qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a).

12

ability to perform work-related activities on a sustained basis.  See AR 475.  Specifically, Dr.

Mansour opined that plaintiff's symptoms prevent her from sitting or standing for more than

fifteen minutes without experiencing severe muscle pain, that she would need to take breaks

every twenty minutes, that she would miss work at least five days per month because of pain and

fatigue, and that the chronic pain causes her focus and concentration problems.  Id.

It is true that "'the opinion of the treating physician is not necessarily conclusive as to

either the physical condition or the ultimate issue of disability.'"  Thomas, 278 F.3d at 956 (citing

Morgan, 169 F.3d at 599-600).  Accordingly, the ALJ was not required to accept Dr. Mansour's

opinion that plaintiff's symptoms "would make it incredibly difficult for her to maintain a full

time job."  AR 475.  Nonetheless, "[a]lthough the ALJ is not bound by the uncontroverted

opinions of the claimant's physicians on the ultimate issue of disability, he cannot reject them

without presenting clear and convincing reasons for doing so."  Hill v. Astrue, 698 F.3d 1153,

1160 (9th Cir. 2012) (quoting Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993)).

Here, because the nonexamining physician did not consider plaintiff's pain or

fibromyalgia in her analysis, Dr. Mansour's opinion about the effects that plaintiff's pain will

have on her ability to work constitute an uncontroverted opinion.  Moreover, the Ninth Circuit has

found that a treating physician's statement that the claimant:

> [W]ould be 'unlikely' to work full time was not a conclusory
> statement like those described in 20 C.F.R. § 404.1527(d)(1), but
> instead an assessment, based on objective medical evidence, of
> [claimant]'s likelihood of being able to sustain full time
> employment given the many medical and mental impairments
> [claimant] faces and her inability to afford treatment for those
> conditions.

Hill, 698 F.3d at 1160.  The ALJ discounts Dr. Mansour's opinion about plaintiff's ability to

work, stating that his opinion is "summary" and that employability determinations are left to the

Commissioner.  AR 21-22.  However, as the Ninth Circuit decided in Hill, this type of opinion is

not considered summary or conclusory.  Hill, 698 F.3d at 1160.

Furthermore, in the next paragraph of the decision the ALJ follows Dr. Acinas's

recommendation as to plaintiff's work limitations, which is the same type of "summary" opinion

as that provided by Dr. Mansour, but with a different conclusion based on plaintiff's asthma and

13

1   migraine symptoms only.  AR 21-22.  While the ALJ is not obligated to follow Dr. Mansour's

2   opinion, it must be afforded significant weight unless the ALJ can provide at least specific and

3   legitimate reasons (if not clear and convincing reasons) supported by substantial evidence for not

4   doing so.  Because Dr. Mansour's opinion is not the type considered to be a summary or

5   conclusory opinion about claimant's ability to work, rejecting his opinion for this reason or

6   because the determination of disability is a decision left to the Commissioner are not specific and

7   legitimate reasons supported by substantial evidence for rejecting Dr. Mansour's opinion.

8       Third, the ALJ argued that "there may be something clinically amiss at this time, but it is

9   either too soon for a specific diagnosis or the claimant's subjective symptoms exceed what could

10  reasonably be expected based on the entirety of the negative testing of record."  AR 20.  The ALJ

11  noted that the majority of the evidence in the record consists of negative results from many

12  diagnostic tests, the presence of eighteen out of eighteen tender points, and a positive ANA.  AR

13  20-21.  The ALJ highlighted that there was "no joint tenderness or synovitis and the claimant

14  exhibited a full range of motion."  Id.  Moreover, the ALJ noted that medical examinations of the

15  claimant showed no evidence of "severe muscle weakness, nerve damage, atrophy, organ

16  damage, or inability to move about in a satisfactory manner."  AR 19.  However, the absence of

17  joint tenderness, synovitis, a limited range of motion, or other concrete signs does not constitute

18  sufficient evidence to discount Dr. Mansour's medical opinion because "[o]bjective physical

19  signs, laboratory results, and x-ray results are generally negative."  Jordan, 370 F.3d at 872; see

20  also Garcia v. Astrue, 2013 WL 253486 (D. Ariz. 2013) (finding that "in stark contrast to the

21  unremitting pain of which fibrositis patients complain, physical examinations will usually yield

22  normal results—a full range of motion, no joint swelling, as well as normal muscle strength and

23  neurological reactions.").  The ALJ's evaluation failed to consider that fibromyalgia diagnoses

24  are diagnoses of exclusion, and that Dr. Mansour's testing and other evaluations have met the

25  standard for diagnosing fibromyalgia.  Furthermore, while the ALJ asserted that it is too soon for

26  a diagnosis, one of the ALJ's findings was that plaintiff has the severe impairments of

27  fibromyalgia and asthma.  AR 16.

28       Additionally, the Court notes that the nonexamining doctor's evaluation was completed on

14

February 27, 2012, and did not include any evidence of Dr. Mansour's diagnosis of fibromyalgia or of the additional testing Dr. Mansour ordered after the initial lab work from September 8, 2011.  AR 84-92, 408-11.  Dr. Acinas's determination also did not include evidence from Dr. Mansour's examinations from February and April 2012, nor evidence of the failed treatment options to which plaintiff refers in her application for reconsideration and her hearing on July 3, 2012.  AR 49, 84-92, 408-11.  Thus, it did not take into account critical aspects of plaintiff's disability, nor did it consider the relevance of the absence of objective proof of disability and failed treatments.  AR 83-93.  Furthermore, because Dr. Mansour is both a treating physician and a specialist in the field most relevant to fibromyalgia (rheumatology), the ALJ should have afforded much more deference to Dr. Mansour's opinion.  Therefore, the ALJ failed to provide substantial evidence that justifies favoring the nonexamining physician's opinion.

B.      ALJ's Evaluation of Plaintiff's Credibility

        1.   Relevant Facts

Plaintiff has been complaining of severe pain in various regions of her body since at least July 2009,[10] when plaintiff complained of sudden onset rib pain which resulted in lab testing and a chest x-ray, both of which were negative.  AR 464-65.

Plaintiff was referred to allergist/immunologist Travis A. Miller, MD, by Nurse Katherine Mittie, FNP, in March 2010, after she was treated for acute sinusitis, increased headaches, vertigo, and nausea despite medication.  AR 277.  Plaintiff began treatment with Dr. Miller for asthma and allergies in April 2010, and her reported symptoms included joint stiffness, nausea, fatigue, headaches, memory loss, confusion, insomnia, vertigo, "soreness almost like sick- weak- heavy limbs," and other symptoms that were related to sinus problems.  AR 280.  Dr. Miller found that plaintiff had significant asthma and allergic rhinitis, and despite medications she had intermittent shortness of breath, chest tightness, and headaches.  AR 271.

In January 2011, Dr. Miller opined that plaintiff was doing much better with her asthma

---

[10]  There is one set of lab results from May 2009, but it is unclear from the record whether these results correlate to plaintiff's complaints of rib pain, which is clearly documented by a chest x-ray taken July 3, 2009.  AR 464-65.

and allergies, but she still had intermittent nasal congestion and headaches. AR 264. In March 2011, plaintiff reported dizziness, vision black outs, trouble thinking, nausea, and vomiting. AR 262. Dr. Miller ordered lab tests and plaintiff had a positive ANA test. AR 244. On March 31, 2011, plaintiff's mother called to request another appointment due to continued headaches and dizziness. AR 260. In April 2011, plaintiff complained of increased headaches, sinus pressure, and an upset stomach. AR 259. Plaintiff continued to follow up with Dr. Miller for asthma and allergies and continued to complain of ongoing headaches through April 2012. AR 255, 257, 396-402.

In July 2011, plaintiff reported to Nurse Mittie that she still had jaw pain that had lasted for a year after her wisdom teeth were removed. AR 234. Nurse Mittie assessed that plaintiff had chronic headaches, stable asthma, and bilateral jaw pain. Id. Nurse Mittie prescribed plaintiff hydrocodone for the pain and referred her to a neurologist, Rajiy S. Pathak, MD, for the chronic headaches. Id.

Dr. Pathak prescribed plaintiff medication for the migraines which appeared to be working on September 14, 2011, when plaintiff met with Nurse Mittie. AR 335. However, on November 11, 2011, plaintiff requested another neurologist referral, claiming that her headaches returned after one to two weeks after starting each new medication and that she was now having headaches daily associated with jaw claudication, nausea and/or vomiting, photophobia, phonophobia, tension, stress, and routine physical activity. AR 324-25. Plaintiff was referred to another neurologist, Firdos S. Sheikh, MD, later in November and reported headaches; neck, back, and jaw pain; and that she was not sleeping well because of the pain. AR 361. On examination, she had a severe neck spasm with decreased range of motion on both sides, occipital triggers bilaterally, severe trapezius spasm, temporal and masseter muscle contractions bilaterally, diminished sensation bilaterally in both median nerves, and a positive Phalen test.[11] AR 362. Dr. Sheikh opined that plaintiff had vascular migraines and that the headaches, neck pain, and back

---

[11]  Phalen tests indicate numbness and tingling that is suggestive of Carpal tunnel syndrome. Carpal Tunnel Syndrome Fact Sheet, National Institute of Health, National Institute of Neurological Disorders and Stroke (2012), http://www.ninds.nih.gov/disorders/carpal_tunnel /detail_carpal_tunnel.htm.

1   pain were likely secondary to inadequate sleep secondary to carpal tunnel syndrome.  AR 363.

2   Dr. Sheikh prescribed plaintiff new medication and ordered x-rays and an electromyography

3   ("EMG") and nerve conduction study.  Id.  The x-rays were negative and the EMG showed

4   evidence of moderate to severe musculoskeletal spasm of the cervical paraspinal muscles with no

5   evidence of radiculopathy in multiple levels.  AR 364-66.

6         In December 2011, plaintiff reported to Dr. Sheikh that the medications were not working

7   and that she was still experiencing neck pain and back pain daily in the afternoon until she went

8   to sleep.  AR 367.  Dr. Sheikh prescribed new medications but plaintiff still complained of daily

9   left jaw pain, constant headaches, and sometimes dizziness.  AR 368-69.

10        In August 2011, plaintiff reported tenderness over her right hip to Nurse Mittie, and on

11  examination was noted to have muscle and adipose atrophy, but an x-ray of the affected area was

12  negative.  AR 336, 354-55, 433-35.  Nurse Mittie referred plaintiff to a rheumatologist, Dr.

13  Mansour, who started treating her in September 2011.[12]  AR 475.  After Dr. Mansour ordered two

14  separate panels of diagnostic tests to test for autoimmune disorders during the course of his

15  treatment, prescribed two different (and powerful) medications, and performed multiple physical

16  examinations; he determined that plaintiff has fibromyalgia, a disease that is very difficult to

17  diagnose and that he is specially equipped to diagnose as a rheumatologist.

18        2.  Legal Standards

19        The ALJ is responsible for determining credibility and resolving ambiguities and conflicts

20  in the medical evidence.  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the

21  medical evidence in the record is not conclusive, "questions of credibility and resolution of

22  conflicts" are solely the functions of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir.

23  1982).  In such cases, "the ALJ's conclusion must be upheld."  Morgan, 169 F.3d at 601.

24        The ALJ's credibility findings must be supported by "specific, cogent reasons for the

25  disbelief."  Lester, 81 F.3d at 834.  The ALJ "must identify what testimony is not credible and

26  what evidence undermines the claimant's complaints."  Id.; see also Dodrill v. Shalala, 12 F.3d

27

28  [12] Only the lab results are available from Dr. Mansour's treatment of plaintiff in September 2011,
    something that the ALJ should have at least inquired about.  AR 475.

915, 918 (9th Cir. 1993).  In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation" such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen, 80 F.3d at 1284.  The ALJ may also consider a claimant's work record and observations by physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

    The Ninth Circuit has found that the claimant is not required to show that her impairment could be expected to cause the severity of the pain she claims, but only that it could cause some degree of pain.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (finding "the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged.");  Smolen, 80 F.3d at 1282 (finding claimant must be able to show that the impairment "could reasonably be expected to (not that it in fact did) produce some degree of symptom.");  Bunnell, 947 F.2d at 346-47 (concluding "adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.").  Unless affirmative evidence shows the claimant is malingering, the ALJ may only reject the claimant's testimony about the severity of plaintiff's pain for reasons that are "specific, clear and convincing."  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2008).

        3.  Analysis

    After reviewing plaintiff's statements and testimony, the ALJ ultimately found that, although plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment for seven reasons: (1) claimant's alleged conditions of asthma, allergies, headaches, and jaw pain have responded well to prescribed medication; (2) that while body pain has been noted with some limitations, examinations have showed no severe muscle weakness, nerve damage, atrophy, organ damage, or an inability to move about in a satisfactory manner; (3) despite a great deal of testing, the medical evidence on record shows no definitive diagnosis to report such claims as extreme fatigue and chronic body pain; (4) there is mention that she made a

1   poor effort in a recent Pulmonary Function Test; (5) it is either too soon for a specific diagnosis

2   or claimant's subjective symptoms exceed what could reasonably be expected based on the

3   entirety of the negative testing record; (6) despite having asthma since childhood, claimant was

4   able to attend charter school and graduate from high school; and (7) that worsening of plaintiff's

5   condition has not been definitively established.  AR 19-20.

6                           i.  Reason One: Conditions' Response to Medications

7       Turning first to the ALJ's reason that claimant's alleged conditions of asthma, allergies,

8   headaches, and jaw pain have responded well to prescribed medication, it is important to separate

9   out treatment related to asthma and treatment related to fibromyalgia—a distinction the ALJ

10  failed to sufficiently make.  AR 19.  With respect to her treatment for asthma—while it is true

11  that plaintiff's lung function appeared to be improving, Dr. Miller wrote a status report on

12  November 11, 2011, in which plaintiff scored sixteen on the ACT, during which time she was on

13  five different medications to control her asthma.[13]  AR 403, 405.  In a subsequent appointment on

14  February 17, 2012, plaintiff scored twenty on the ACT while taking the same prescribed

15  medications as before.  AR 396.  In an appointment on April 6, 2012, plaintiff scored thirteen and

16  a half on the ACT and was experiencing respiratory symptoms including coughing, chest

17  tightness, and congestion while still taking the same medications.  Id.  This fluctuation of asthma

18  control while taking the same handful of prescribed medications indicates that her asthma was not

19  completely under control and in fact was unpredictable.  The ALJ failed to point to evidence

20  demonstrating that plaintiff's asthma was well-controlled with medication, and thus, this is not a

21  specific, cogent reason supported by record for discrediting plaintiff's testimony.

22      The ALJ also did not provide sufficient evidence that plaintiff's fibromyalgia pain

23  symptoms responded well to medication.  The only thing the ALJ says on this point is "these

24  conditions have responded well to prescribed medication."  AR 19.  In fact, all the medical

---

25  [13] ACT stands for Asthma Control Test and is used to determine whether asthma is under control.
26  Jia CE et al., The Asthma Control Test and Asthma Control Questionnaire for assessing asthma
    control: Systematic review and meta-analysis, U.S. National Library of Medicine National
27  Institutes of Health (March 2013), http://www.ncbi.nlm.nih.gov/pubmed/23058645.  A score of
    less than nineteen is an indication of poor control.  Id.  The ACT has good diagnostic accuracy for
28  assessment of controlled and not well-controlled asthma.  Id.

1    evidence indicates that the pain medication prescribed to plaintiff was not working properly

2    without debilitating side effects.  When plaintiff saw Dr. Mansour in February 2012, she was

3    prescribed Vicodin and Ibuprofen for pain but was still experiencing "chronic muscle pain and

4    fatigue."  AR 410.  Dr. Mansour then prescribed Neurontin to treat what he thought was probably

5    fibromyalgia symptoms.  Id.  On April 12, 2012, when Dr. Mansour next saw plaintiff, he

6    diagnosed her with fibromyalgia because she met the ACR criteria.  AR 408-09.  He found that

7    she was not able to tolerate Neurontin and he started her on Lyrica.  Id.  Then in Dr. Mansour's

8    letter from July 26, 2012, he stated that both Neurontin and Lyrica caused plaintiff significant

9    sedation and problems with short-term memory, AR 475, and in the hearing on July 3, 2012,

10   plaintiff testified that she stopped taking Lyrica the day before because Dr. Mansour said that she

11   was not reacting well to it.  AR 58-59.  This evidences that plaintiff's fibromyalgia pain was not

12   responding well to medication because she could not tolerate it.

13        When pain medications that would reduce restrictions on a claimant's ability to work

14   cause side effects that otherwise interfere with the claimant's ability to work, the claimant's

15   failure to take pain medication due to side effects of the medication provides a sufficient

16   justification for failing to take said medication and supports crediting the claimant's pain

17   testimony.  Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989) (concluding the ALJ may not "rely

18   on the claimant's failure to take pain medication where evidence suggests that the claimant had a

19   good reason for not taking medication.");  Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987)

20   (finding the ALJ's reliance of claimant's failure to take pain medication was erroneous where the

21   medication caused side effects which also impacted his ability to work).  Therefore, because the

22   ALJ failed to identify evidence showing plaintiff's conditions responded well to medication, the

23   ALJ has not provided specific, cogent reasons supported by the record for discrediting plaintiff on

24   this issue.

25               ii.  Reason Two: Examinations Showed No Physical Limitations

26        The ALJ's second reason is that while body pain has been noted with some limitations,

27   examinations have showed no severe muscle weakness, nerve damage, atrophy, organ damage, or

28   an inability to move about in a satisfactory manner.  AR 19.  However, as discussed above,

physical examinations of claimants with fibromyalgia "will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." Garcia, 2013 WL 253486, at 5.  Therefore, the lack of evidence of these symptoms from physical examinations of plaintiff does not constitute a specific, cogent reason that is sufficient to discredit plaintiff.

### iii.   Reason Three: Medical Evidence Shows No Definitive Diagnosis

Next, the ALJ noted that, despite a great deal of testing, the medical evidence on record shows no definitive diagnosis to report such claims as extreme fatigue and chronic body pain. This argument by the ALJ is both unsupported by evidence and contradicted by the ALJ's own decision.  Three pages prior to this finding, the ALJ found "[t]he claimant has the following severe impairments: asthma and fibromyalgia."  AR 16.  Furthermore, Dr. Mansour's MSS states that plaintiff suffers from fibromyalgia, AR 475, which is a disease characterized by:

> [W]idespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress. In other cases, symptoms gradually accumulate over time with no single triggering event. Women are much more likely to develop fibromyalgia than are men. Many people who have fibromyalgia also have tension headaches, temporomandibular joint (TMJ) disorders, irritable bowel syndrome, anxiety and depression.

Mayo Clinic Staff, Fibromyalgia, Mayo Clinic (Feb. 20, 2014) http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/CON-20019243.  Therefore, because The ALJ found plaintiff has fibromyalgia; plaintiff's treating rheumatologist, Dr. Mansour, diagnosed plaintiff with fibromyalgia; plaintiff's symptoms of extreme fatigue and chronic body pain are the primary symptoms of fibromyalgia; and plaintiff's pre-existing conditions and onset fit the typical pattern for the disease; the ALJ has not sufficiently established that the medical evidence on record shows no definitive diagnosis that would support plaintiff's claims.  Thus, the ALJ erred in discrediting plaintiff on this basis.

### iv.   Reason Four: Poor Effort on Pulmonary Function Test

The ALJ's fourth reason for discounting plaintiff's credibility was that she gave poor

1    effort on her January 2011, Pulmonary Function Test.  In one portion of the ALJ's decision, it is

2    noted that "breathing tests occasionally showed inadequate attempts."  AR 19.  In the next

3    paragraph, the ALJ described the only instance in the record of such a poor attempt, which is that

4    "claimant made a poor effort in her latest Pulmonary Function Test."  AR 20.  However, as

5    plaintiff notes, there is nothing in the file to indicate that this poor effort was intentional, and thus,

6    should not affect the credibility of plaintiff's testimony.  Pl.'s Mot. Summ. J. 22.  Moreover,

7    plaintiff completed Pulmonary Function Tests both before this instance in April 2010, and after in

8    November 2011, with no indication of poor effort on either test.  AR 271, 403.  Furthermore,

9    plaintiff's poor effort could have reasonably been seen as evidence that her fatigue from the

10   fibromyalgia was causing her difficulty in completing the test properly on this particular day in

11   January 2011.  As discussed above, it is the ALJ's "duty to develop the record."  DeLorme, 924

12   F.2d at 849.  Here, because the ALJ failed to conduct further investigation as to the reasons for

13   claimant's "poor effort" and failed to provide specific, cogent reasons supported by the record for

14   why this one instance nullifies claimant's credibility, this is not a sufficient basis for rejecting

15   plaintiff's claim.

16              v.   Reason Five: Too Soon for Diagnosis and Symptoms Unreasonable

17          Turning to the ALJ's fifth reason that plaintiff's allegations regarding the severity of her

18   symptoms are unsupported by objective evidence, the Ninth Circuit has concluded that

19   fibromyalgia is a definite but elusive affliction "diagnosed entirely on the basis of patients'

20   reports of pain and other symptoms."  Benecke, 379 F.3d at 589.  It was therefore an error for the

21   ALJ to cite to the lack of objective evidence when discounting plaintiff's credibility because the

22   nature of the disease eludes objective testing and is based entirely on a patient's subjective

23   reports.

24              vi.   Reason Six: Claimant Finished High School

25          With respect to the ALJ's sixth reason for discounting plaintiff's credibility, the ALJ

26   asserted that the extent of the symptoms described are inconsistent with the fact that plaintiff was

27   able to get her high school diploma, got good grades, and drove herself to school.  AR 18.

28   However, this is not an entirely accurate characterization of plaintiff's testimony.  Plaintiff

1  testified that she was unable to continue to attend regular classes for the last few months of

2  twelfth grade and had to be homeschooled, and before that was "home hospitalized" a few

3  times—where she would stay home and a teacher would come to her house once a week to go

4  over any lessons.  AR 54.  Moreover, she described that she took one college class junior year of

5  high school, attended one semester of community college, and wants to continue when she starts

6  feeling better.  AR 51.  Plaintiff further testified that her high school allowed her to go into school

7  only one or two times a week to accommodate her illness, AR 54, and during her semester of

8  community college, she only took two classes—amounting to only two days per week for three

9  hours, which she missed a couple of times due to her illness.  AR 55.  The ALJ also highlights

10 that plaintiff drove herself to school within the context of talking about high school, however,

11 plaintiff only testified to driving herself to the college classes.  AR 56.

12      Furthermore, there is a slight discrepancy in plaintiff's testimony where in one place she

13 says she "did good" in school, AR 51, and when her attorney asked if plaintiff said her grades in

14 the community college courses were good, she said "[t]hey were okay. I haven't gotten my final

15 grades in them" and that she was having difficulty taking those classes because of concentration

16 problems.  AR 56.  However, the ALJ does not mention these differing descriptions as credibility

17 evidence, instead only stating that plaintiff said she "got good grades."  AR 18.  In addition,

18 plaintiff's high school transcript is evidence in the record, and it is clear that plaintiff generally

19 received good grades in high school.  AR 201.  However, in her last semester of high school,

20 plaintiff's grades were lower than in the preceding semesters, she took almost half of her classes

21 pass/fail, and even failed one class.  Id.  This is entirely consistent with plaintiff's testimony.  AR

22 50-57, 201.

23      Activities that are sporadic or punctuated with rest may be consistent with fibromyalgia

24 because "disability claimants should not be penalized for attempting to lead normal lives."

25 Reddick, 157 F.3d at 722.  Moreover, "the claimant need not show that her impairment could

26 reasonably be expected to cause the severity of the symptom she has alleged, she need only show

27 that it could reasonably have caused some degree of symptom."  Smolen, 80 F.3d at 1282 (citing

28 Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995); Fair, 885 F.2d at 601).  The Court

1   therefore finds that the ALJ failed to provide "clear and convincing" reasons supported by

2   substantial evidence as to why the evidence that plaintiff completed high school and one semester

3   of community college was indicative that plaintiff's symptoms were less severe than she claimed,

4   especially considering the accommodations by her school, the decline in her high school grades,

5   and the minimal course load taken in her semester of college.

6                    vii.   Reason Seven: Worsening Not Definitively Established

7           Finally, the ALJ's reason that the worsening of claimant's condition has not been

8   definitively established is not sufficiently supported with specific, cogent reasons from the record

9   to legitimize discrediting plaintiff.  The only evidence the ALJ discussed on this point is that

10  plaintiff was only diagnosed with fibromyalgia in April 2012, despite being treated by a

11  rheumatologist since September 2011, and that the majority of the evidence in the record consists

12  of negative test results.[14]  AR 20.  While plaintiff was not officially diagnosed with fibromyalgia

13  until April 2012, Dr. Mansour thought that it was likely that fibromyalgia was the cause of

14  plaintiff's symptoms since at least February 2012, and had been treating her for complaints of

15  severe pain (a primary symptom of fibromyalgia) since September 2011 (seven months prior to

16  the official diagnosis).  AR 410-11, 475.  Furthermore, plaintiff had been complaining of severe

17  pain in various regions of her body since at least July 2009, when plaintiff complained of sudden

18  onset rib pain.  AR 464-65.

19          The trajectory of plaintiff's pain, and treatment with numerous physicians and different

20  specialists outlined above shows that not only has plaintiff been complaining of various types of

21  migraines and muscle pain for years, it has progressively expanded to different parts of the body

22  and her pain has been resistant to many different pain medications.  The ALJ failed to provide

23  specific, cogent reasons such as inconsistencies in the medical evidence or in plaintiff's testimony

24  to justify an adverse credibility determination on this issue.  Moreover, because fibromyalgia

25  produces "long-term but variable levels of muscle and joint pain, stiffness, and fatigue," Jeffrey

26  ――――――――――――――――

[14] As discussed above, "once the claimant produces objective medical evidence of an underlying

27  impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a
    lack of objective medical evidence to fully corroborate the alleged severity of pain."  Bunnell,

28  947 F.2d at 345.

1    Larson, Fibromyalgia, in 2 The Gale Encyclopedia of Medicine 1326–27 (Jacqueline L. Longe et

2    al. eds., 2d ed. 2002)), and "the symptoms can be worse at some times than others," Jordan, 370

3    F.3d at 872, any variation in the record regarding the severity of her pain can be reasonably

4    explained as a symptom of her disease.

5         Furthermore, the fact that Dr. Mansour diagnosed plaintiff in April 2012, despite treating

6    her since September 2011, is not a valid reason to discredit plaintiff.  Courts generally accept

7    retrospective diagnoses made by treating physicians, so long as the ALJ does not present clear

8    and convincing reasons for refusing to accept such diagnoses and the doctor can state legitimate

9    reasons for those diagnoses.  Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1456 (9th

10   Cir. 1995).  Dr. Mansour's diagnosis was based on the legitimate reasons that plaintiff had a

11   positive ANA, eighteen out of eighteen tender points, and chronic pain.[15]  Therefore, it is

12   irrelevant that the diagnosis was made after seven months of treatment, and thus, the ALJ has not

13   provided specific, cogent reasons supported by the record for discrediting plaintiff.

14   C.    Remand is Required

15        The ALJ erred in her consideration of the medical opinion evidence.  Generally, "[w]here

16   the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or

17   examining physician, [the Court credits] that opinion as 'a matter of law.'"  Lester, 81 F.3d at

18   830–34 (quoting Hammock v. Bowen, 879 F.2d 498, 502 (9th Cir. 1989) (finding that if doctors'

19   opinions and plaintiff's testimony were credited as true, plaintiff's condition met a listing)).

20   Crediting an opinion as a matter of law is appropriate when, taking that opinion as true, the

21   evidence supports a finding of disability.  See Smolen, 80 F.3d at 1292.

22        Courts retain flexibility, however, in applying this crediting-as-true theory.  Connett, 340

23   F.3d at 876 (remanding for further determinations where there were insufficient findings as to

24   whether plaintiff's testimony should be credited as true).  "In some cases, automatic reversal

25   would bestow a benefits windfall upon an undeserving, able claimant."  Barbato v. Comm'r of

26   Soc. Sec. Admin., 923 F. Supp. 1273, 1278 (C.D. Cal. 1996) (remanding for further proceedings

27

28   [15] See section above on Dr. Mansour's opinion for a detailed explanation of why the ALJ should
     have afforded substantial weight to Dr. Mansour's opinion.

1  where the ALJ made a good-faith error in that some of his stated reasons for rejecting a

2  physician's opinion were legally insufficient).

3       Here, the ALJ erred because the stated reasons for rejecting Dr. Mansour's opinion are

4  legally insufficient.  "Such good faith errors inevitably will occur.  Reasonable judicial minds

5  sometimes will disagree regarding proper application of the rather imprecise standard of 'specific,

6  legitimate' reasons."  Barbato, 923 F. Supp. at 1278.  "[U]nder the rule in Lester, the [medical]

7  opinion will trigger benefits whenever the ALJ's previously stated reasons for rejecting the

8  opinion fall short of the ill-defined 'specific, legitimate' standard."  Id. (footnote omitted).  "A

9  reviewing court should have discretion to avoid this inequitable result by remanding the case for

10  further administrative proceedings.  Remand necessitates delay, but the cost of this delay should

11  be balanced against the risk of an erroneous determination."  Id.; see also McAllister v. Sullivan,

12  888 F.2d 599, 603 (9th Cir. 1989) (remanding for further proceedings because Secretary of Health

13  and Human Services was in a better position than the court to point to evidence in the record to

14  provide specific, legitimate reasons to disregard treating physician's opinion).  Accordingly, the

15  Court exercises its discretion to remand this case to the Commissioner for further proceedings.

16  See McAllister, 888 F.2d at 603 (holding that court may remand to allow ALJ to provide the

17  requisite specific and legitimate reasons for disregarding medical opinions).

18       Similarly, the ALJ erred in discrediting plaintiff.  With fibromyalgia claims, the ALJ is

19  justified in an adverse credibility finding if the ALJ points to substantial evidence that the

20  claimant gave inconsistent testimony or failed to participate in aggressive treatment options or

21  medical examinations.  McElroy v. Astrue, 237 Fed. Appx. 167, 169 (9th Cir. 2007) (finding that

22  for credibility determinations, "ALJ may consider factors such as reputation for truthfulness,

23  inconsistencies in a claimant's testimony or between his testimony and his conduct, daily

24  activities, work record, and testimony from doctors or third parties regarding the nature, severity,

25  and effect of the alleged symptoms.");  Walshe v. Barnhart, 70 Fed. Appx. 929, 931 (9th Cir.

26  2003) (concluding ALJ properly discounted claimant's credibility when ALJ identified that the

27  testimony he found not credible was that regarding the severity of her pain and fatigue in light of

28  claimant's "'failure to take measures to improve her condition,' e.g. [claimant]'s refusal to take

prescription medication."); <u>Miller v. Astrue</u>, 233 Fed. Appx. 590, 592 (8th Cir. 2007) (finding

that the ALJ properly discounted claimant's assertion that she was unable to work based on

consideration of claimant's daily activities, the ALJ's personal observations, an examining

physician's report of claimant's "questionable effort" and lack of participation in his examination,

lack of aggressive medical treatment, the inconsistency of plaintiff's assertions with the objective

medical evidence, and claimant's sporadic work history). Moreover, "[g]eneral findings are

insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

undermines the claimant's complaints." <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).

Furthermore, "when outstanding issues must be resolved before a disability determination can be

made, remand is required." <u>Id.</u> (citing <u>Kent v. Astrue</u>, 335 Fed. Appx. 673, 675 (9th Cir. 2009)

(additional citations omitted)).

Here, the ALJ erred in discrediting plaintiff because while the ALJ stated reasons for

questioning plaintiff's testimony, the ALJ failed to present substantial evidence to legitimize

those reasons, such as evidence that plaintiff gave inconsistent testimony or that she failed to

participate in aggressive treatment or medical examinations. This type of evidence is required to

discredit a claimant's testimony regarding the severity of her subjective fibromyalgia pain.

Moreover, all "discrepancies" cited by the ALJ are more reasonably explained by the actual

symptoms of plaintiff's diagnosis of fibromyalgia, and the ALJ failed to present sufficient

evidence to support a contrary conclusion. Furthermore, the plaintiff's subjective complaints of

pain are supported by the conclusions of treating rheumatologist, Dr. Mansour, whose opinion

should have been afforded substantial weight, as well as the evidence of the positive ANA test

and the presence of eighteen out of eighteen tender points. The ALJ failed to present specific,

clear and convincing reasons for discrediting plaintiff's subjective complaints of pain. Therefore,

because the ALJ failed to present substantial evidence to discredit plaintiff and failed to present

specific, clear and convincing reasons for discrediting plaintiff's subjective testimony regarding

the severity of her pain, the Court exercises its discretion to remand this case to the Commissioner

for further proceedings. <u>See</u> <u>McAllister</u>, 888 F.2d at 603.

////

27

1      CONCLUSION

2      Accordingly, for the reasons stated above, IT IS HEREBY ORDERED that:

3      1.      Plaintiff's motion for summary judgment (ECF No. 13-1) and request for remand

4  are granted in part;

5      2.      The Commissioner's cross-motion for summary judgment (ECF No. 14-1) is

6  denied; and

7      3.      This matter is remanded for further proceedings consistent with this order.

8  DATED: July 9, 2014

9  _____

ALLISON CLAIRE
10  UNITED STATES MAGISTRATE JUDGE